

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

February 8, 2024

**BY ECF**
The Honorable Nelson S. Román
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

**Re: *United States v. Shawn Rains*, 22 Cr. 18 (NSR)**

Dear Judge Román:

The Government respectfully submits this letter in advance of the sentencing of Shawn Rains (the "defendant" or "Rains"). Rains was convicted, following a two-week jury trial, of mail fraud conspiracy, mail fraud, and money laundering conspiracy. As the Probation Office correctly concluded, the applicable sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 210 to 262 months' imprisonment. In any event, regardless of the Guidelines range that the Court deems applicable, the Government respectfully requests a sentence of at least 168 months' (*i.e.*, fourteen years') imprisonment to reflect the seriousness of the offense, Rains's history and characteristics, the need for adequate deterrence, and Rains's utter lack of remorse.

## I. Background

From approximately 2009 to 2017, Shawn Rains and Joseph Maharaj orchestrated a scheme to defraud their employer OrthoNet LLC ("OrthoNet") of more than $4 million by false and fraudulent pretenses, by setting up three shell companies that billed OrthoNet for work that those companies did not do and inducing OrthoNet to pay the fraudulent bills sent by those companies. Maharaj, Rains, and their coconspirators then laundered the proceeds of the fraud. PSR ¶ 14.[1]

OrthoNet, now a division of Optum, is a healthcare benefit management business with offices in White Plains, New York. OrthoNet's clients include health maintenance organizations, medical groups, indemnity insurers, preferred provider organizations, managed care organizations, workers' compensation insurers, and other payees. PSR ¶ 15. During the relevant time period, Rains and Maharaj were executives at OrthoNet. Rains was an Executive Vice President responsible for overseeing OrthoNet's Focused Claims Review ("FCR") and Data Management

[1] "PSR" refers to the Pre-Sentence Investigation Report prepared by the United States Probation Office in connection with this case; "Tr." refers from the trial transcript in this case; "GX" refers to Government exhibits admitted at trial; and "Mem." refers to Rains's sentencing memorandum.

Departments. Maharaj reported to Rains, and ran OrthoNet's FCR department. FCR is responsible for a payment and integrity program that compiles claims information to ensure that what the provider billed on a claim was accurately performed. PSR ¶ 16.

Rains abused his senior position at OrthoNet to induce OrthoNet to pay invoices from three companies—Worldwide Data Solutions LLC ("WWDS"), Payro Consulting LLC ("Payro"), and Data Processing Central ("DPC")—for work that was never performed by those companies. PSR ¶ 17.

Payro and DPC

Rains and Maharaj recruited Maharaj's stepfather Edwin Romero to participate in the fraud by setting up two shell companies—Payro and DPC—to receive money from OrthoNet for work that these companies did not do. Specifically, in or about 2009, Rains and Maharaj met with Romero and told Romero that they were interested in having Romero set up a company to receive checks from OrthoNet so that they could pay for work that was being done "off the books." During a subsequent conversation, Rains proposed that, after withholding money for taxes, Romero could keep 25% of the money from OrthoNet and then give the rest to Rains and Maharaj in cash. At Rains's and Maharaj's direction, Romero created an LLC. Rains instructed Romero to use Legal Zoom to create the LLC. PSR ¶ 18.

In or about June 2009, without disclosing the relationship between Maharaj and Romero, Rains and Maharaj arranged for OrthoNet to hire Romero's consulting company. After that time, Romero began receiving checks from OrthoNet, despite doing no work for the company. Initially, Romero used his own name in the name for the LLC, but was quickly directed to remove his name, leading Romero to change the LLC's name to Payro. Romero created business bank accounts for Payro and obtained a UPS box to receive checks from OrthoNet. PSR ¶ 19.

In or around August 2009, after Payro had already begun fraudulently billing OrthoNet for consulting work, Rains and Maharaj arranged for OrthoNet to simultaneously hire Romero as an OrthoNet employee for a no-show job. After an initial interview, Romero did not come into the office and did not do any work for OrthoNet. Nonetheless, he began receiving a salary from OrthoNet, which he shared with Rains and Maharaj, using the same distribution arrangement that they used for the money sent to Payro. Eventually, the relationship between Romero and Maharaj was discovered at OrthoNet, and Romero was terminated as an employee effective December 31, 2009. Nonetheless, Payro continued to bill as a consultant. PSR ¶ 20.

Between September 2009 and February 2016, Payro submitted invoices to OrthoNet on a periodic basis for work purportedly (but not actually) done by Payro. Neither Payro nor Romero ever did any work for OrthoNet, nor did Romero create or review the Payro invoices submitted. Rather, Maharaj created Payro invoices, which contained vague descriptions of work purportedly (but not actually) done by Payro; much of that work was actually being done internally by OrthoNet employees or by a legitimate OrthoNet vendor, or would be unnecessary because of work they were doing. The invoices were then submitted to OrthoNet, and approved for payment, typically by Rains, but also by Maharaj. PSR ¶ 21.

At a certain point, after the fraud had been underway for several years, Rains and Maharaj told Romero that the dollar amounts being paid by OrthoNet to Payro were hitting an internal cap

for third-party consultants. As a result, Rains and Maharaj asked Romero to create another shell company, which, like Payro, would receive payments from OrthoNet for work that the company did not do. Based on this direction from Rains and Maharaj, Romero created DPC. Rains directed Romero to use Legal Zoom to create the LLC, and to use the money Payro had fraudulently obtained from OrthoNet to pay for this service. Between in or about March 2013 and February 2016, DPC submitted invoices to OrthoNet on a periodic basis for work purportedly done by DPC. As with Payro, DPC did no work for OrthoNet, nor did Romero create or review the DPC invoices submitted to OrthoNet. The invoices were then submitted to OrthoNet and approved for payment by Rains or Maharaj. PSR ¶ 22.

Payro (including its predecessor) was paid approximately $2.3 million via wire or check by OrthoNet from 2009 to 2016. DPC was paid over $555,000 between in or about April 2013 and April 2016, including some payments by check. For both Payro and DPC, Romero, at the direction of Rains and Maharaj , would retrieve and deposit any checks from OrthoNet; he would then keep a portion (35-40%) of the proceeds of the fraud in the Payro or DPC bank accounts to pay taxes on the income generated by those companies, and withdraw the remainder in cash. Romero would then keep a portion of the cash—initially 25%, and later 12.5%—and give the remainder to Maharaj, which Maharaj would then split with Rains. PSR ¶¶ 23-24.

WWDS

Rains and Maharaj also used a friend of Maharaj's, Raymil Perez,[2] to start a third shell company, WWDS, to receive fraudulent payments from OrthoNet. At Maharaj's direction, Perez—who had a background in human resources, and no experience in healthcare claims processing or any related field—registered an LLC with the name WWDS, opened a business bank account for WWDS, and opened a UPS mailbox in the name of WWDS. Maharaj created a website for WWDS, and created email accounts associated with that website, including an email address in Perez's name (the "Perez WWDS Email Address"), which Maharaj operated. PSR ¶ 25.

Between October 2010 and in or about January 2017, WWDS submitted invoices to OrthoNet on a periodic basis for work purportedly done by WWDS. However, WWDS did not do any work for OrthoNet, nor did Perez create or submit the WWDS invoices. PSR ¶ 26.

Rather, in or about fall 2010, Rains and Maharaj recruited Angel Ayala,[3] who was the Director of OrthoNet's Data Management department and reported to Rains, to participate in the fraud by supplying information that would be included in the WWDS invoices. Specifically, Rains and Maharaj invited Ayala to lunch at a restaurant in White Plains. At that lunch, Rains asked Ayala to provide him and Maharaj with details of work that Ayala had done in his capacity as an OrthoNet employee and the amount of time he spent doing that work. Rains explained that he and Maharaj would then put that information in fraudulent WWDS invoices and submit them to OrthoNet for payment, even though Ayala (not WWDS) had actually done that work. Rains further

---

[2] Perez pled guilty to mail fraud, mail fraud conspiracy, and money laundering conspiracy in *United States v. Raymil Perez*, 21 Cr. 229 (KMK). He is awaiting sentencing.

[3] Ayala pled guilty to mail fraud and mail fraud conspiracy in *United States v. Angel Ayala*, 21 Cr. 803 (CS). He is awaiting sentencing.

instructed Ayala to use his personal email address, not his OrthoNet email address, to conceal the fraud from OrthoNet. PSR ¶ 27.

After that meeting, Ayala did as Rains instructed—he sent descriptions of the work the was doing for OrthoNet and the time he spent doing that work, at first to Rains, and then eventually to Maharaj, all using personal email. Maharaj then created WWDS invoices detailing that same work that was already being done by OrthoNet's Data Management group, but greatly exaggerating the hours worked. The invoices were then submitted to OrthoNet from the Perez WWDS Email Address. Maharaj, Rains, and/or Ayala, in their capacities as OrthoNet employees, then approved the fraudulent invoices for payment, and they were in fact paid. PSR ¶ 28.

Maharaj, Rains, and Ayala also attempted to create a "paper trail," to make it appear as if work was legitimately being done by WWDS, when it was not. Specifically, using personal email addresses, Ayala also sent Maharaj emails attaching and describing work product Ayala was doing in his capacity as an OrthoNet employee; that work product was then submitted from the Perez WWDS Email Address to Ayala, Maharaj, and Rains at their OrthoNet email addresses, as work purportedly done by WWDS. PSR ¶ 29.

Between 2010 and 2017, OrthoNet paid WWDS approximately $1.25 million by check sent through the mail. OrthoNet mailed the checks to the WWDS mailing address. After receiving the checks by mail from OrthoNet, Perez—at Maharaj's direction—deposited the money in the WWDS bank account, and then, after holding back a portion of that money for taxes and a cut for himself, would give the rest of the money to Maharaj. Specifically, Maharaj would tell Perez when and where to meet, often in Manhattan. Prior to the meetings, Maharaj would instruct Perez to bring cash. Maharaj would ask for cash amounts approximately ranging from $8,000 to $30,000. Maharaj provided the instruction to not withdrawal more than $10,000 at one time or the transaction will get flagged. Perez withdrew cash over several transactions and held the cash until meeting with Maharaj in person. Eventually, Perez signed blank checks and gave them to Maharaj. PSR ¶ 30.

While giving money to Maharaj, Perez understood that others were involved in the scheme. For example, in explaining why he needed money quickly, Maharaj told Perez that he had to give a cut of the money to his boss or former boss living in Maine. Rains was Maharaj's supervisor. In addition, during a portion of the conspiracy, Rains lived primarily in Maine. PSR ¶ 31.

Maharaj paid Perez approximately $1,500 per month for participating in the fraud. Perez also paid taxes on the income generated by WWDS on his personal taxes (because WWDS was an LLC), which resulted in a higher marginal tax rate for Perez. Maharaj paid Perez approximately a $10,000 bonus at the end of the year as compensation. Further, there was a period of time when Perez was unemployed and Maharaj allowed Perez to draw approximately $400 per week from WWDS. The remainder of the proceeds of the fraud (less taxes and payments to Perez) were transmitted to Maharaj. PSR ¶ 32.

Maharaj paid Ayala intermittently between 2010 and 2015 for assisting in the fraud, always in cash, totaling approximately $18,000. Specifically, Maharaj would hand Ayala cash in an envelope on occasions when Ayala was in OrthoNet's White Plains office (Ayala generally worked remotely but would come into the office once or twice a month). On certain occasions, Rains

would tell Ayala that Maharaj had something for him, and then Maharaj would pay Ayala in cash for his participation in the fraud. And on one occasion, while in Las Vegas, Maharaj—in Rains's presence—handed Ayala cash as compensation for his participation in the fraud. PSR ¶ 33.

Maharaj took steps to conceal the relationship between himself and WWDS, and between himself and Perez. In addition to having Perez set up WWDS, prior to the creation of the LLC, Maharaj "unfriended" Perez on Facebook, explaining to Perez that this was so there would be no indication that they were friends. Maharaj told Perez that, if OrthoNet called, Perez should call Maharaj and ask him what to say in response. PSR ¶ 34.

No Show Job for Handyman

While employed at OrthoNet, Rains and Maharaj began a side business investing in real estate through a company they formed called SRJM Holdings LLC ("SRJM"). In or about 2014, Rains and Maharaj hired Benjamin Urena, a carpenter by trade and a cousin of Maharaj's wife, to perform maintenance on SRJM's properties and evaluate additional investments. PSR ¶ 35.

Initially, Urena worked on weekends, and Rains and Maharaj paid him in cash or checks. In or about 2015, Urena began working for SRJM full-time. At a certain point in 2015, Urena indicated that he did not believe he was being sufficiently compensated for his full-time work for SRJM. As a result, Rains and Maharaj got Urena a no-show job as an "auditor" at OrthoNet. Urena came to OrthoNet's offices for an interview and then began receiving payment from OrthoNet despite doing no work for the company. PSR ¶¶ 36-37.

In connection with his hiring, Urena was given a computer and directed to log in but not do any work. Because Urena was typically on-site at SRJM properties, he had difficulty logging in via the desktop. As a result, Rains and Maharaj took Urena to a Best Buy location in Yonkers and bought him a laptop, instructing him to log in to OrthoNet's systems remotely from the SRJM worksite. PSR ¶ 38.

OrthoNet's Investigation and Rains's Efforts to Cover Up the Fraud

In or about January 2017, OrthoNet discovered that Urena, who was purportedly being supervised by Maharaj, had been on OrthoNet's payroll for approximately two years but had not done any apparent work for the company and rarely logged into his work computer. When OrthoNet representatives attempted to question Maharaj about Urena, Maharaj at first lied, and then resigned rather than answer further questions. When OrthoNet representatives questioned Rains about Urena, Rains pretended not to know Urena and falsely stated that Urena had not done any carpentry work for any OrthoNet employees—when, in fact, Urena had done extensive carpentry work for Rains himself. PSR ¶ 39.

OrthoNet then began looking into whether any other individuals associated with Maharaj were being paid by OrthoNet and discovered that Romero, who was Maharaj's stepfather, had received millions of dollars in payments to Payro. Around the time that OrthoNet began investigating, Rains took multiple steps to cover up the fraud. In particular, during a conversation with Joachim Aiwazian, the Chief Executive Officer of one of OrthoNet's legitimate vendors, Key Software, Rains asked Aiwazian to provide proof of the work that Key Software's company had

done for OrthoNet over the past several years. Aiwazian, who was aware that OrthoNet was investigating fraudulent payments to outside companies for work that had not been done, told Rains that the documents that Rains had requested did not exist. Rains then asked whether Aiwazian could create these documents, and Aiwazian falsely told Rains that it would be impossible to create such documents, because Aiwazian feared such documents could be used for a nefarious purpose related to covering up the fraud. PSR ¶ 40.

At around this same time, OrthoNet representatives spoke to a series of OrthoNet employees in connection with its investigation of fraudulent payments to outside vendors. On or about March 9, 2017, OrthoNet representatives spoke to Rains in connection with this investigation, including asking Rains about his awareness of the payments sent to Payro. During this meeting, Rains falsely stated that he had no knowledge of the hiring, managing or invoicing of Payro. PSR ¶ 41.

Later that same day, Rains approached Leonard Friscia, an employee in OrthoNet's Data Management group, and asked Friscia to put data from the Data Management group onto a thumb drive, in violation of OrthoNet policy, which prohibited the use of external devices. Friscia, who was aware of OrthoNet's internal investigation, became worried that Rains was seeking data to cover up the fraud, and he refused Rains's request. PSR ¶ 42.

Shortly thereafter, Rains contacted Ayala and asked him to meet in-person. On March 17, 2017, Ayala—at Rains's direction—drove to Worchester, Massachusetts, to meet Rains at a restaurant. Maharaj, who had left OrthoNet by this time, was also present for the meeting. During the meeting, Rains directed Ayala to send him, via an offshore encrypted website, internal OrthoNet documents, which Ayala understood could be used to cover up the fraud. During the Worcester meeting, Rains also told Ayala that Maharaj's computer had been recently destroyed, which Ayala understood to mean that he should remain quiet about the fraud as the likelihood of getting caught was low. PSR ¶ 43.

On or about March 19, 2017, Rains resigned from OrthoNet rather than meet in-person with OrthoNet's outside counsel to answer questions regarding Payro, among other things. In July 2017, an OrthoNet executive ("Executive-1") approached Ayala with questions regarding, among other things, WWDS. Ayala called Rains multiple times to rehearse what Ayala should tell Executive-1. Consistent with Rains's directive, Ayala lied to Executive-1 and said, in sum and substance, that WWDS had done work for OrthoNet when it had not. As a result of the lies Ayala told at Rains's direction, Ayala remained employed at OrthoNet until late 2021. PSR ¶¶ 44-45.

## II. The Guidelines Calculation

### A. Probation's Guidelines Calculation

Probation correctly calculates the applicable Guidelines range as follows (*see* PSR ¶¶ 54-71):

    a. Counts One, Two, and Three constitute a single group under U.S.S.G. § 3D1.2.

    b. The applicable Guideline is U.S.S.G. § 2S1.1, which provides that the base offense level is the offense level for the underlying offense from which the laundered funds

      were derived if (A) the defendant committed the underlying offense; and (B) the offense level for that offense can be determined.

c. The Guideline for the underlying offense is U.S.S.G. § 2B1.1.

d. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

e. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the loss is more than $3,500,000 but less than $9,500,000, the offense level is increased by 18 levels.

f. Pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, the offense level is increased by 2 levels.

g. Pursuant to U.S.S.G. § 2S1.1(b)(2), 2 levels are added because the defendant was convicted under 18 U.S.C. § 1956.

h. Pursuant to U.S.S.G. § 3B1.1, because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, the offense level is increased by 4 levels.

i. Pursuant to U.S.S.G. § 3B1.3, because the defendant abused a position of private trust in a manner that significantly facilitated the commission or concealment of the offense, the offense level is increased by 2 levels.

j. Pursuant to U.S.S.G. § 3C1.1, 2 levels are added because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction.

According to the PSR, the defendant zero six criminal history points. Accordingly, the defendant is in criminal history category I.

A total offense level of 37 and criminal history category I yields an applicable Guidelines range of 210 to 262 months' imprisonment.

**B. Rains's Guidelines Disputes**

Rains raises several disputes to Probation's Guidelines calculation. None has merit.

<u>Paragraph 57: Loss amount</u>

In calculating the loss amount for purposes of the Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. 3(A)(i). Pecuniary harm is "reasonably foreseeable" if "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* cmt. 3(A)(iv). "The loss amount attributable to a particular defendant includes the loss caused by the defendant's own acts and omissions and, 'in the case of jointly undertaken criminal activity[,] ... all reasonably foreseeable acts and

omissions of others in furtherance of the jointly undertaken criminal activity.'" *United States v. Bliss*, 566 F. App'x 49, 52 (2d Cir. 2014) (quoting U.S.S.G. § 1B1.3(a)(1)).

Here, Rains and his coconspirators caused over $4 million in actual losses to the victim OrthoNet. Given Rains's role in the conspiracy, the full amount of the loss caused by the scheme was reasonably foreseeable to him. Accordingly, Rains is responsible for the full loss amount. *See Bliss*, 566 F. App'x at 52 (affirming loss amount calculation holding participant in conspiracy responsible for full loss amount caused by the conspiracy).

Rains nonetheless disputes the loss calculation for several reasons. First, Rains argues that "the Government never presented any financial reconciliation/calculation" at trial. Mem. 1-2. That is incorrect. The Government proved the loss amount at trial through, among other things, a stipulation agreed to by Rains. *See* GX 1001 (stipulation setting forth fraudulent invoices totaling $4,043,798.69).

Second, Rains argues that the Government did not "present any evidence showing that Mr. Rains received any funds generated from the offenses." Mem. 2. That too is incorrect. Rains's own bank records, admitted into evidence by stipulation (GX 1004), showed hundreds of thousands of dollars in cash deposits into Rains's accounts during the relevant time period. *See, e.g.*, GX 36, 61, 62. In any event, whether Rains in fact received fraud proceeds is irrelevant, both to his guilt on the charges in the Indictment and to the loss amount calculation for purposes of the Guidelines. There is no requirement that the defendant himself financially benefit from the offense. The defendant's gain is only used as a measure of the loss amount if the victim's loss is not ascertainable. *See* U.S.S.G. § 2B1.1 cmt. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only if there is a loss but it reasonably cannot be determined*." (emphasis added)). Here, the victim's loss can be determined with certainty.

Third, Rains disputes that he is responsible for the loss amount attributable to WWDS. *See* Mem. 2. But the evidence at trial overwhelmingly established that Rains was not only actively involved in the WWDS portion of the fraud—he orchestrated it. Specifically, Ayala testified that Rains invited him to lunch at a restaurant in White Plains and proposed that Ayala provide Rains and Maharaj with descriptions of work Ayala was already doing as an OrthoNet employee, which Rains and Maharaj would then include in fraudulent WWDS invoices. Tr. 506:19-508:18. Rains directed Ayala to communicate with him and Maharaj regarding the scheme using personal email, as opposed to OrthoNet email, in order to hide the illegal scheme from OrthoNet. Tr. 508:19-509:11. After this initial meeting, Ayala did as Rains directed him—he sent descriptions of the work he was doing as an OrthoNet employee and the time he spent doing that work via personal email, which then was included verbatim in the fraudulent WWDS invoices, but with the hours greatly exaggerated. Tr. 510:7-12, 512:17-537:17. Ayala also sent emails using his OrthoNet email address, often copying Rains, designed to make it look like WWDS was doing work for OrthoNet that it was not in fact doing. Tr. 539:12-547:19, 550:11-555:15. Ayala testified that Maharaj gave him envelopes full of cash as payment for his participation in the scheme. Tr. 557:22-558:25. Rains would often let Ayala know when Maharaj would be paying him, and on at least one occasion Rains was present when Maharaj handed him cash. Tr. 559:1-20.

The Government introduced documentary evidence at trial that corroborated Ayala's testimony. For instance, Ayala sent an email from his personal email address to Rains's personal email address, which included a list of tasks he did for OrthoNet and the amount of time spent on

each task. GX 160. Those tasks were then copied and pasted word-for-word into fraudulent invoices from WWDS to OrthoNet, with the hours greatly exaggerated. GX 21 at 1. That email only makes sense if Rains was a knowing participant in the WWDS portion of the fraud. Several other emails admitted at trial similarly show the defendant's intentional participation in the WWDS portion of the scheme. *See, e.g.*, GX 111, 112, 113, 114, 115.

Paragraph 58: Sophisticated means

A two-level increase is warranted under U.S.S.G. § 2B1.1(b)(10)(C) where "the offense … involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." "For purposes of subsection (b)(10)(C), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. 9. Examples of sophisticated means provided in the commentary to the Guidelines include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*

Here, the fraud was accomplished through the use of three shell companies—WWDS, Payro, and DPC—each of which fraudulently billed OrthoNet for work that those companies did not do. OrthoNet then paid those shell companies, and the fraud proceeds were deposited into the bank accounts of those shell companies. The evidence at trial established that Rains "caused" this conduct, including by directing coconspirators to form shell companies to receive stolen funds from OrthoNet.

Rains disputes the application of the "sophisticated means" enhancement on grounds that "Rains did not direct … Romero to create the shell companies … Payro … and … DPC." Mem. 2. But that is exactly what the evidence at trial showed that Rains did. Romero testified that Rains directed him to set up the shell company (first known as Romero Consulting, then changed to Payro) using LegalZoom, and that Rains then explained to Romero how the proceeds of the fraud would be shared among the co-conspirators after Romero withdrew the funds from the shell company's bank account in cash. Tr. 106:24-108:25.

Rains is correct that Perez, who created WWDS at Maharaj's direction, did not know Rains by name. *See* Mem. 2. But that is irrelevant. The evidence (recounted above) was that Rains was intimately involved in the operation of the WWDS portion of the fraud. He knew that WWDS was a shell company that was doing no work for OrthoNet, that Maharaj was creating fake invoices for WWDS and submitting them to OrthoNet, and that the fake invoices, some of which Rains later approved, were directing payment to WWDS. Under these circumstances, there is no question that the sophisticated means enhancement applies.[4]

Paragraph 59: Money laundering enhancement

Rains objects to the two-level increase under U.S.S.G. § 2S1.1(b) on the ground that "Probation has been using U.S.S.G. § 2B1.1 to compute Mr. Rains' base offense level and specific

---

[4] In his plea agreement, Maharaj conceded that the sophisticated means enhancement applies here.

offense characteristics" and thus "the increase under § 2S1.1(b)(2)(B) has no application here." Mem. 3. Rains misunderstands how the Guidelines apply to his offenses of conviction.

"In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts)." U.S.S.G. § 2S1.1 cmt. 6. "[T]he offense level applicable to a Group is the offense level … for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).

Pursuant to U.S.S.G. § 2S1.1, the base offense level is "(1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(1). "The 'underlying offense' referred to in section 2S1.1(a)(1) is 'the offense which produced the laundered funds.'" *United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010). So long as the conditions of subsections (A) and (B) are met, "the base offense level for money laundering pursuant to U.S.S.G. § 2S1.1(a)" is "[t]he total Guidelines offense level for such 'underlying offense,' after being independently calculated by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3." *Id.* (internal citations omitted). After the base offense level is determined, any applicable specific offense characteristic offenses under § 2S1.1(b) are applied, including, where applicable, a two-level increase "[i]f the defendant was convicted under 18 U.S.C. § 1956." U.S.S.G. § 2S1.1(b)(2)(B).

Here, Rains was convicted of a count of laundering funds (the money laundering conspiracy charged in Count Three) and a count for the underlying offense (the mail fraud scheme charged in Count Two). Further, the mail fraud conspiracy of which Rains was convicted in Count One "involve[es] substantially the same harm." U.S.S.G. U.S.S.G. § 3D1.2. Accordingly, Counts One, Two, and Three are treated as a single Group.

Applying § 2S1.1(a)(1), Rains committed the underlying offense (mail fraud) and the offense level for mail fraud can be determined under U.S.S.G. § 2B1.1. Accordingly, the base offense level for § 2S1.1(a)(1) is the total offense level under § 2B1.1, including all appropriate adjustments. Then, two levels are added under § 2S1.1(b)(2)(B) because Rains was convicted under 18 U.S.C. § 1956. Accordingly, the total offense level under § 2S1.1 is necessarily higher than the total offense level would be under § 2B1.1, and thus § 2S1.1 is the Guideline used for determining the offense level of the Group under § 3D1.3(a).

Paragraph 61: Abuse of position of private trust

A two-level increase is warranted under U.S.S.G. § 3B1.3 where "the defendant abused a position of … private trust … in a manner that significantly facilitated the commission or concealment of the offense." A position of "private trust" is one that is "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. 1. "For this adjustment to apply, the position of … private trust must have contributed in some significant way to facilitating the

commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.*

Here, Rains was indisputably in a position of "professional or managerial discretion" at OrthoNet. He was the Executive Vice President of the Claims and Data Management departments—the very departments that were involved in the fraud. Rains directly supervised two OrthoNet directors, Maharaj and Ayala, who were also coconspirators in the offense. Rains's supervisory position enabled him to engage and pay vendors without significant oversight from others at the company. By abusing that position, Rains was able to approve the onboarding of the three fraudulent vendors and the payment of those vendors for years, despite those companies not doing any work for OrthoNet. Indeed, Linna Sica testified that Rains's signature on certain of the fraudulent invoices was treated as authorization to pay those invoices, and that the company relied on that authorization prior to paying the vendors. Tr. 215:6-11, 218:15-17, 229:22-24. In addition, on the occasions where others questioned the amounts being billed by the fraudulent vendors, Rains vouched for the vendors and claimed (falsely) that the vendors were doing work for his department. *See, e.g.*, GX 122. Others relied on Rains's word, which made detection of the offense more difficult. Accordingly, Rains's position of private trust "significantly facilitated" both the commission and concealment of the offense.

Rains argues that the enhancement does not apply because "before Mr. Rains signed the invoices at issue, they were all approved by … either Mr. Maharaj or Mr. Ayala." Mem. 3. There is no evidence in the record to support that assertion. Indeed, at trial, Ayala testified that he approved the fraudulent WWDS invoices for the first year or so of his participation in the fraud, after which point he never saw the invoices again. Tr. 538:16-539:11. Thereafter, the WWDS invoices were signed by either Rains or Maharaj, but there is absolutely no evidence that the invoices signed by Rains were first approved by Maharaj. The same goes for the Payro and DPC invoices Rains signed. In any event, the signing of the fraudulent invoices was not the only respect in which Rains abused his position of private trust. As discussed, the entire fraudulent operation was facilitated by Rains's managerial role at OrthoNet.[5]

<u>Paragraph 62: Leadership</u>

A four-level increase is warranted under U.S.S.G. § 3B1.1(a) where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a defendant was an organizer or leader, "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. 4.

Here, the offense involved at least five people: Rains, Maharaj, Perez, Romero, and Ayala. In addition, the offense involved several other people whose "services" were "used …

---

[5] Maharaj conceded, in his plea agreement, that he abused his position of private trust and that this enhancement applies.

unknowing[ly]," U.S.S.G. § 3B1.1 cmt. 3, such as the other employees at OrthoNet who were involved in processing the payments on the fraudulent invoices.

Rains indisputably exercised a leadership role in the offense. Two different witnesses who participated in the scheme with the defendant—Ayala and Romero—testified at trial that Rains set up the whole scheme and actively ran it for years. *See, e.g.*, Tr. 107:18-23, 108:5-13, 128:20-129:18, 508:23-25, 509:1-6, 525:19-24. Both testified that it was Rains who recruited them into the scheme in the first instance and directed them how to accomplish their respective roles in the scheme. *See id.* Romero further testified that Rains explained to him how the fraud proceeds would be split—with a larger share going to Rains and Maharaj than to Romero. Tr. 108:3-13.

Rains disputes the application of the enhancement on the ground that "the PSR fails to identify the five individuals that he allegedly managed." Mem. 3. However, the enhancement applies where the "*criminal activity* … involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (emphasis added). There is no requirement that the defendant himself personally manage all five participants. Indeed, the commentary explicitly states that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of *one or more* other participants," U.S.S.G. § 3B1.1 cmt. 2 (emphasis added); not *all* of the participants.

Rains also disputes the application of the enhancement on the ground that he "merely suggest[ed] committing the offense." Mem. 4. But for the reasons already explained, Rains did far more than merely suggest committing the offense—he played an active role in decision-making for the scheme, he recruited other coconspirators into the scheme, he had a right to a larger share of the fruits of the crime than certain other coconspirators, and played an extensive role in organizing the offense. All of these support application of the leadership enhancement.[6]

Paragraph 63: Obstruction of justice

A two-level increase is warranted under U.S.S.G. § 3C1.1 where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to … the defendant's offense of conviction and any relevant conduct." The commentary to the Guidelines provides: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. 1.

Here, the evidence at trial showed not only that Rains lied to OrthoNet investigators, but that he instructed Ayala to lie. Tr. 570:17-576:7. Further, during the course of the OrthoNet investigation, Rains sought documents that could be used to cover up the fraud from Ayala, Friscia, and Aiwazian. Tr. 377:19-381:1, 334:22-340:2, 568:12-569:25. That conduct "was purposefully calculated, and likely, to thwart the investigation or prosecution" of the offense, by misleading

[6] Maharaj acknowledged, in his plea agreement, that the leadership enhancement applies to him and provides for a four-level increase in his offense level.

OrthoNet investigators—and in turn the Government—about who was involved in the scheme. Indeed, due in part to Rains's actions, Ayala remained employed at OrthoNet for years after the scheme was initially uncovered in 2017, until his involvement in the scheme became known to law enforcement. Tr. 497:8-14.

Zero-point offender

Rains claims that he is entitled to the two-point reduction in the offense level set forth in U.S.S.G. § 4C1.1 for defendants with zero criminal history points. *See* Mem. 6. A defendant is not entitled to the two-point reduction under § 4C1.1 if the defendant "received an adjustment under §3B1.1 (Aggravating Role)." U.S.S.G. § 4C1.1(a)(10). For the reasons explained above and in the PSR, Rains correctly received a four-point enhancement for his leadership role in the offense. Accordingly, the two-point reduction under § 4C1.1 is not available to him.

* * * * *

Consistent with the above, as Probation correctly concluded, the applicable Guidelines range is 210 to 262 months' imprisonment.

## III. Applicable Law

The Sentencing Guidelines continue to provide important guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Though they are advisory and not mandatory, the Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46 (2007). It follows that district courts should treat the Sentencing Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49; *see also Booker*, 543 U.S. at 264 (explaining that district courts must "consult" the Sentencing Guidelines and "take them into account" when sentencing). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall*, 552 U.S. at 49.

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## IV. Discussion

Regardless of what Guidelines range the Court finds to be applicable, a sentence of at least 168 months' (*i.e.*, fourteen years') imprisonment is necessary to reflect the seriousness of the offense, Rains's history and characteristics, the need for adequate deterrence, and Rains's complete lack of remorse.[7]

### A. Nature and Circumstances of the Offense

Rains orchestrated a brazen, years-long scheme against his employer OrthoNet. Rains and his coconspirator Maharaj engaged friends and family members to open three shell companies, which Rains and Maharaj then used to bill OrthoNet for work those companies did not do. Rains and Maharaj then approved the invoices for payment, causing over $4 million in actual losses to OrthoNet over eight years.

This offense was possible only because Rains abused his position of trust as Executive Vice President. By virtue of that position, Rains had discretion over hiring of both employees and vendors for OrthoNet's Data Management department; this allowed the coconspirators to perpetrate the fraud for years undetected.

Rains played a central role in this offense. Contrary to his characterization in his sentencing submission, Rains was critical to the planning and execution of the crime. Romero and Ayala both testified that Rains was the one who brought them into the scheme, and who explained to them exactly how they should perpetrate the fraud. Rains was also instrumental in the attempted cover-up of the offense; he attempted to obtain documents that he could use to make it seem like the fraudulent vendors were doing work for OrthoNet and instructed Ayala to lie to OrthoNet investigators.

Rains's conduct was particularly egregious because he recruited people to participate in the offense, such as Ayala, who likely never would have otherwise committed crimes. Although Ayala chose to participate in the offense of his own free will, Rains capitalized on Ayala's trust in him to convince him to participate in the fraud. Further, Rains's offense was not a one-time poor decision. Rains made the decision to participate in this fraud over and over again, over the course of many years. First, Rains and Maharaj recruited Romero to start Payro. Simultaneously, Rains and Maharaj got Romero a no-show job at OrthoNet, which Romero kept until it was discovered that Romero had been hired as both a vendor and an employee. To bilk more money out of OrthoNet, Rains and Maharaj had Romero set up a second shell company, DPC, that billed at the same time as Payro. At the same time, Ayala and Perez were recruited to participate in the WWDS side of the fraud. Then Rains and Maharaj stole even more money from OrthoNet by hiring Ben

---

[7] Probation recommends a sentence of 144 months' (*i.e.*, 12 years') imprisonment. PSR p. 28.

Urena for a no-show job, effectively having OrthoNet pay the salary of their carpenter for their own venture, SRJM. In short, Rains and Maharaj continued stealing from their employer up until the day they were caught. This has all the hallmarks of a serious offense which must be met with a serious punishment.

    **B. History and Characteristics of the Defendant**

Rains implores the Court to consider his positive personal qualities—including his military service, volunteer work, and relationship to his family—in sentencing him. *See* Mem. 8-10. He has also submitted letters attesting to his positive personal qualities and dedication to his daughter. *See* Mem., Ex. B.

It is, of course, appropriate for the Court to take Rains's history and characteristics into account in connection with sentencing. But these discussions of Rains's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to steal and defraud. As Judge Marrero astutely observed, this approach:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors. . . .
>
> Yet, for all of their outward rectitude, these otherwise good people suffer a fatal flaw: they lead a double life. Somewhere at the core, in a distorted dimension of the soul, the public image they present is as false as the lies they tell to sustain the appearances of an exemplary life. And somehow, for reasons that always defy reason, they fall into crime, doing wrongful deeds that seem aberrational, selfish and greedy acts that, when caught, they claim are entirely out of character with their otherwise law-abiding lives.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010). Similarly, Rains's military service and volunteer efforts, while commendable, are typical for an educated white-collar offender and do not warrant a downward departure or variance. *See United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)); *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for a prominent businessman, did not support nine-level downward departure); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities not atypical).

Rains, like many white-collar criminals, led a double life. According to his family and friends, he was kind, and a good friend and father. Yet for almost a decade he carried on an

extensive, multi-million-dollar fraud. This fraud was not aberrant. It was not a lapse in judgment, or a momentary slip-up. Whatever positive personal qualities Rains has, he also orchestrated a fraud against his employer for years.

**C. The Need for Deterrence**

The Court must consider the need for the sentence imposed to promote both general and specific deterrence.

Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* It is particularly important to deter those, who by their profession have discretion over funding sources, to resist the temptation to embezzle what is entrusted to them.

Although Rains is a first-time offender, there is a strong need for specific deterrence. In particular, Rains has demonstrated a complete lack of remorse. Even to this day, Rains does not accept responsibility for his criminal conduct. Instead, he continues to baselessly deny even the most basic facts about his involvement in the offense. Under these circumstances, the need for specific deterrence is considerable.

**D. Forfeiture & Restitution**

Rains should be ordered to pay forfeiture of $4,043,798.69—the amount of money that flowed through bank accounts Rains controlled indirectly, by virtue of his leadership role in the offense.

Proceeds of a crime, in order to be forfeitable by a defendant, "need not be personally or directly in the possession of the defendant…in order to be subject to forfeiture," but rather "must have, at some point, been under the defendant's control…in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012).[8] The Second Circuit has held that a defendant "controls" funds, giving rise to forfeiture liability, to the extent he can have the funds transferred to third parties or for his own benefit, even if those funds were never held in his own accounts. *See United States v. Bergstein*, 788 Fed. Appx. 742, 748 (2d Cir. 2019) (summary order) (ordering forfeiture post-*Honeycutt* where "Bergstein effectively controlled the

---

[8] Prior to the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017), the Second Circuit also held defendants jointly and severally liable for proceeds acquired by coconspirators. *Contorinis*, 692 F.3d at 147. *Honeycutt* rejected such coconspirator liability, however, and so the defendant is only liable for the proceeds of the offense he personally controlled, either directly or indirectly.

proceeds of the [third party investment funds] as he was able to transfer the funds to shell companies and use the funds for personal expenses").

Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *See United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019). A defendant may control proceeds in the possession or control of lesser members of a conspiracy by virtue of his leadership role in that conspiracy. In *Honeycutt* itself, the Supreme Court drew a distinction between (1) a mastermind in charge of the entire conspiratorial operation, who is liable for the gross amount of criminal proceeds produced through the enterprise's criminal activities; and (2) a lower-level conspirator who only had access to and control over a small fraction of the tainted proceeds directly in his possession. This distinction is so because the mastermind, unlike the low-level defendant in *Honeycutt*, ultimately "'obtains' the property—whether 'directly or indirectly.'" *Honeycutt*, 137 S. Ct. at 1633.

Rains should also be ordered to pay restitution of $4,043,798.69 (the amount of the victim's actual losses), plus the reasonable attorneys' fees incurred by the victim in connection with the criminal prosecution. *See* 18 U.S.C. §§ 3663A(b)(1) & (4); *United States v. Afriyie*, 27 F.4th 161, 163 (2d Cir. 2022) (attorneys' fees incurred in connection with criminal investigation or prosecution recoverable as restitution), *cert. denied*, 143 S. Ct. 326 (2022).

## V. Conclusion

For the reasons set forth above, the Court should impose a sentence of at least 168 months' imprisonment.

                        Respectfully submitted,

                        DAMIAN WILLIAMS
                        United States Attorney

By:   /s/
       Stephanie Simon
       Jim Ligtenberg
       Benjamin Klein
       Assistant United States Attorneys
       Tel: (212) 637-2581 / 2665 / (914) 993-1908

cc: Murdoch Walker, Esq.